UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re:                                                                                Chapter 11 (Subchapter V)

Insource Supplies LLC,                             Case No. 24-10571-JPM

                                     Debtor.
----------------------------------------------------------x

## DEBTOR'S SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

**THE DEBTOR IS A SMALL BUSINESS UNDER THE BANKRUPTCY CODE. AS SUCH, THE DEBTOR IS ELIGIBLE FOR CERTAIN ADDED PROTECTIONS AND BENEFITS DESIGNED TO MAXIMIZE THE DEBTOR'S OPPORTUNITY TO REMAIN IN BUSINESS EVEN OVER THE OBJECTION OF CREDITORS. THE DEBTOR IS FILING THIS PLAN TO RESTRUCTURE ITS DEBTS AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 1189 AND 1190. THE DEBTOR IS SEEKING CONFIRMATION OF THE PLAN PURSUANT TO 11 U.S.C. §1191 WITHOUT FORMAL APPROVAL OF A DISCLOSURE STATEMENT. THE PLAN, HOWEVER, CONTAINS SUFFICIENT FINANCIAL AND OPERATING INFORMATION FOR CREDITORS TO MAKE AN INFORMED DECISION ON WHETHER TO VOTE TO ACCEPT THE PLAN.**

Insource Supplies LLC (the "Debtor") hereby proposes the following Second Amended Plan of Reorganization, pursuant to the provisions of Subchapter V of Chapter 11 of Title 11 of the United States Code (the "Plan").

## BACKGROUND

### A. Description and History of the Debtor's Business

The Debtor is a medical supply company operating mainly in the secondary market. The Company was started by Eli Bensoussan in the wake of the Covid-19 pandemic to meet the demand for personal protective equipment (*i.e.*, gloves and masks). The Debtor's revenues quickly grew to approximately $12 million by 2021, but with the ebbing of the pandemic, revenues declined considerably to approximately $1.0 million by 2023. After Covid-19 ended, the Debtor attempted but was unable to obtain exclusive distribution contracts from area hospitals and medical providers. By late last year, the Debtor found itself at a business crossroads, having exhausted its banking facility and without liquidity to pay accrued debt. However, in a good faith effort to pay creditors, Mr. Bensoussan pivoted and repositioned the Debtor's business to provide emergency procurements to fill gaps in medical supplies needed by hospitals and medical providers as an independent sales agent for Astor Pharmaceutical LLC ("Astor"). Astor is a relatively strong medical supply distribution company and views the Debtor as a good source of potential sales. Accordingly, just prior to bankruptcy, Astor and the Debtor entered into an agreement, denominated as the "Independent Contractor Agreement" (the "Agreement"), which will be assumed as part of the Plan for purposes of 11 U.S.C. §365.

Pursuant to the Agreement, Astor will supply and ship the goods needed to complete orders procured by Mr. Bensoussan on behalf of the Debtor based upon a 50%-50% sharing of net profits. The Agreement eliminates the burden of paying to purchase and store inventory, while allowing Mr. Bensoussan to concentrate on generating new sales. The Debtor projects that the relationship with Astor will generate about $50,000 per month in revenues during the first year, with increases thereafter. After payment of reduced residual operating expenses and salaries, the Debtor projects it will be able to generate Net Disposable Income of approximately $30,000 per month ("NDI") with potential increases over the life of the Plan up to approximately $55,000 per month. Thus, if the Debtor meets its long-term goals, Class 2 General Unsecured Claims shall be entitled to receive surplus distributions up to 100% of their Allowed Claims. The Debtor intends to devote the NDI to pay creditors under the Plan and anticipates increases to the NDI beginning in the fall and winter of 2024.

Historically, the Debtor financed its pre-petition operations with a line of credit provided by CFBank National Association (the "Lender"), secured by a lien on the Debtor's inventory and accounts receivable, and personally guaranteed by Mr. Bensoussan. After the Debtor fell into default in February 2024, the Lender served a restraint on the Debtor's pre-petition operating account with JPMorgan Chase Bank. The Lender also obtained the appointment of the Receiver in March 2024. This triggered the Debtor's need to seek Chapter 11 relief, replete with the decision made by Mr. Bensoussan to continue the Debtor's business as a vehicle to pay creditors.

B. **Debtor's Subchapter V Case**

On April 2, 2024 (the "Petition Date"), the Debtor commenced this bankruptcy case by filing a voluntary petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code. On April 3, 2024, Samuel Dawidowicz was appointed as the Subchapter V trustee in this Chapter 11 case.

In bankruptcy, the Lender has asserted a secured claim in the total amount of $1,626,276.17 including principal, interest and fees. However, the residual collateral supporting this claim is far less as the Debtor was not able to fill many pre-petition orders. The claim is secured by cash deposits of $11,000 and accounts receivable. For purposes of the Plan, and based upon the agreement of Debtor and Lender, the Lender is being treated under a separate class as a partially secured creditor in the total Allowed amount of $1,500,000.

Shortly after the Petition Date, the Lender and Receiver moved to continue the appointment of the Receiver and excuse compliance with the turnover provisions of Section 543 of the Bankruptcy Code. By Order dated May 22, 2024, the turnover motion was denied, and the receivership was effectively terminated. Following a transition, the Debtor now operates its business as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As part of the turnover, the Debtor has opened negotiations with the Lender seeking the entry of a stipulation for the use of cash collateral, which the Debtor hopes to finalize shortly.

The Debtor has scheduled unsecured claims in the total sum of approximately $850,000. Additionally, Tax Claims have been filed by New York State and New Jersey for unpaid taxes in the total amount of approximately $66,400. A motion for a bar date fixing a deadline for the filing of claims has been filed.

The Debtor and the Lender have entered into a Stipulation of Settlement contemporaneously herewith (the "Lender Settlement") providing for the allowance and treatment of the Lender's secured claim and the use of cash collateral pending confirmation of the Plan. A copy of the Lender Settlement is attached hereto as Exhibit "A". Based on the Lender Settlement which is incorporated by reference, the Debtor anticipates a consensual confirmation hearing.

**ARTICLE I**
**Definitions**

For the purposes of this Plan, the following terms shall have the respective meanings set forth below (such meanings to be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires):

1.1     "Administrative Claims" shall mean all costs and expenses of administering the Chapter 11 case allowed under Section 503(b) or 330(a) of the Bankruptcy Code, including professional fees of the Debtor's counsel and the fees of the Subchapter V Trustee.

1.2     "Allowed" shall mean a Claim or Interest or any portion thereof that (i) has been timely filed with the Bankruptcy Court and is liquidated in amount and has not been objected to; (ii) has been listed by the Debtor in its Schedules as being neither contingent, unliquidated nor disputed; or (iii) has been allowed by a Final Order of the Bankruptcy Court.

1.3     "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

1.4     "Business Day" shall mean any day other than a Saturday, Sunday or "legal holiday" as defined in Rule 9006(a).

1.5     "Causes of Action" shall mean any and all actions, causes of action, suits, debts, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise.

1.6     "Claim" shall mean the debts and liabilities as defined in Section 101(5) of the Bankruptcy Code.

1.7     "Class" shall mean a group of Claims or Interests that are substantially similar in nature and are grouped together for similar treatment pursuant to the Plan.

1.8     "Confirmation Date" shall mean the date upon which the Confirmation Order is entered by the Bankruptcy Court.

1.9     "Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan.

1.10    "Disputed Claim" shall mean any Claim designated as disputed, contingent or unliquidated on the Schedules and/or any Claim against which an objection to the allowance thereof has been interposed by the Debtor prior to the Confirmation Date.

1.11    "Effective Date" shall mean the latter date upon which following events occur: (1) the Confirmation Order is entered and becomes immediately enforceable, (2) the first payments due under the Plan are made, including the first payment of $24,666.67 on account of Lender's allowed secured claim is made to Lender, and (3) the $11,000 of residual cash held on deposit at JPMorgan Chase Bank and the $10,000 monthly adequate protection payments have been paid to the Lender.

1.12    "Equity Interests" shall mean the existing pre-petition 100% membership interest of the Debtor held by Eli Bensoussan.

4

1.13     "Final Order" shall mean an order or judgment which has not been stayed and as to which order or judgment the time to appeal or seek review or rehearing has been waived or expired and as to which no appeal, petition for review or rehearing is pending or, in the case of an appeal, any such appeal or petition for review, rehearing or certiorari has been dismissed.

1.14     "Petition Date" shall mean April 2, 2024.

1.15     "Priority Tax Claim" shall mean a Claim that is entitled to priority treatment under Section 507(a)(8) of the Bankruptcy Code regardless of whether the claim is asserted as secured or as an unsecured priority by the respective taxing authority.

1.16     "Professional" shall mean any attorney, accountant, or other professional retained by the Debtor in this Chapter 11 Case.

1.17     "Professional Fees" shall mean any claim for compensation and/or reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code by any Professional retained by order of the Bankruptcy Court.

1.18     "Schedules" shall mean the schedule of assets and liabilities and the statement of financial affairs filed by the Debtor as required by Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments thereto.

1.19     "Subchapter V Trustee" shall mean Samuel Dawidowicz who was appointed by the United States Trustee by *Notice Appointing Subchapter V Trustee* filed on the docket for this Chapter 11 Case on April 4, 2024 [ECF No. 2].

## ARTICLE II
## Summary

The Plan establishes and provides treatment of the following claims:

Class 1.    Lender's partially Secured Claim in the allowed amount of $1,500,000.
Class 2.    The allowed claims of the remaining General Unsecured Creditors aggregating approximately $850,000.
Class 3.    Equity Interests.

The Debtor shall pay Administrative Claims anticipated to total $75,000 on the Effective Date, plus make quarterly payments to governmental units holding Priority Tax Claims totaling approximately $66,400 over the statutory period of five years pursuant to 11 U.S.C. §1129(a)(9) at a rate of $4,500 per quarter. The Debtor's principal, Eli Bensoussan shall personally contribute $40,000 on the Effective Date as a new value contribution to help fund Administrative expenses and augment the cash on deposit in the Debtor's DIP account.

All creditors should refer to Articles III through VII of the Plan for information regarding the precise treatment of their particular claims. The Court must find that all creditors

who do not accept this Plan will receive at least as much under this Plan as such claim holder would receive in a Chapter 7 liquidation. Since the Debtor has virtually no enterprise value in liquidation, as its pre-petition assets consisting of $11,000 in cash and doubtful accounts receivable are subject to the secured claim of the Lender, there is nothing available for unsecured creditors in a liquidation under Chapter 7. To demonstrate this point, the Debtor has prepared a Liquidation Analysis, which is annexed hereto as Exhibit "B".

The Debtor shall also establish that it can generate sufficient NDI over the life of the Plan (five (5) years) to make the required payments to pre-petition creditors while continuing to operate the Debtor's business. The Debtor has prepared current financial information to support projections for the years 2024 through 2029, which are collectively annexed hereto as Exhibit "C", together with a written business plan. The financial projections show that the Debtor will initially generate approximately $30,000 per month in NDI (as defined by 11 U.S.C. §1191(d) of the Bankruptcy Code), with potential increases over the life of the Plan up to approximately $55,000 per month.

## ARTICLE III
## Unclassified Claims

### A. Treatment of Administrative Claims

3.1 Administrative Claims. Administrative Claims consisting of the accrued legal fees and expenses of the Debtor's professionals are not classified under the Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code. The sole professional retained by the Debtor is its counsel, Goldberg Weprin Finkel Goldstein LLP. The Debtor is also responsible to pay the fees owed to the Subchapter V Trustee. The Allowed Administrative Claims shall be paid in cash on the Effective Date or the entry of an Order of the Bankruptcy Court allowing such Administrative Claim. The Debtor projects that professional fees will aggregate $75,000, including the fees of the Subchapter V Trustee ($25,000) and counsel ($50,000).

### B. Treatment of Priority Tax Claims

3.2 Priority Tax Claims. All unpaid tax obligations are also unclassified under the Plan in accordance with Section 1123(a)(1) of the Bankruptcy Code. Each holder of an Allowed Priority Tax Claim (whether subject to a lien or otherwise) shall be paid in equal quarterly annual installments commencing on the Effective Date and continuing over a period of not more than five (5) years, in an amount equal to the Allowed amount of such Priority Tax Claim, together with statutory interest.

The Debtor acknowledges that the outstanding taxes owed to New Jersey and the IRS aggregate $66,383.72, itemized as follows:

| Claimant | Amount of Claim |
|---|---|
| New Jersey | $36,963.91 |
| IRS | $29,419.81 |
| | $66,383.72 |

The five-year pay-out requires quarterly payments of $4,500, based upon monthly accruals of $1,500 to cover the taxes and statutory interest computed as follows: $66,383.72 with 12% interest per annum[1] over 60 months = $88,621.88/60 = $1,477.03 per month.

## ARTICLE IV
## Classification of Claims and Interests

4.1  Designation of Classes Pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code. Set forth below is the designation of Classes of Claims and Interests. Administrative Claims and Priority Tax Claims of the kinds specified in Sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code (set forth in Articles III and IV above) have not been classified and are excluded from classification in accordance with Section 1123(a)(1) of the Bankruptcy Code.

4.2  Classes.  All Claims and Interests shall be divided into the following Classes for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows, which Classes shall be mutually exclusive:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claim of Lender | Yes | Yes |
| Class 2 | General Unsecured Claims | Yes | Yes |
| Class 3 | Equity Interests | N/A | No |

## ARTICLE V

## Treatment of Claims and Interests

5.1  Class 1:  The Lender's Secured Claim

(a)  Classification. Class 1 consists of the Secured Claim of the Lender for a business loan in the allowed amount of $1,500,000 which is allowed pursuant to the Lender Settlement and paid in accordance with the Plan.

(b)  Treatment.  Prior to or on the Effective Date, the residual cash held by the Debtor as of the Petition Date totaling $11,000 shall be paid over to the Lender to

---
[1] IRS rate is 12% while the New Jersey rate is 11.5%.

reduce the balance of the Secured Claim to $1,489,000. This balance of $1,489,000 shall be paid on the first day of each month over the life of the Plan (60 months) in equal monthly installments of $24,666.67 without additional interest. The balance shall also be reduced at the end of the life of the Plan by the credits of $10,000 per month paid pursuant to the Lender Settlement as adequate protection beginning on August 1, 2024 through confirmation of the Plan. By way of example, if the Debtor has made $20,000 of payments as adequate protection pursuant to the Lender Settlement, the 60th and final payment due at the end of the life of the Plan will be in the reduced amount of $4,666.67. In the event of a conversion to Chapter 7, dismissal of the bankruptcy, or the failure to confirm the Plan, or complete the payments under the Plan, Lender shall not be constrained or limited to seeking only the allowed amount of its Secured Claim, and the Lender will be entitled to seek and recover the full amount of its claim of $1,626,276.17. Lender's liens shall remain on the accounts receivable existing at the time of the Effective Date and shall continue to attach to all after acquired accounts receivable until the Lender's claim has been paid in full. Notwithstanding the foregoing, the initial payment shall be made on the Effective Date and the plan shall not be effective until the initial payment is made.

  5.2  Class 2:  General Unsecured Claims

    5.2.1  Classification. Class 2 consists of allowed General Unsecured Claims, excluding the undersecured claim of the Lender.

    5.2.2  Treatment. Each holder of an Allowed General Unsecured Claim shall receive a *pro rata* quarterly cash payment, over a total period of sixty (60) months from the Effective Date, based upon the balance of NDI available after monthly payments to the Lender in the amount of $24,666.67 and monthly payments of $1,500 to the Priority Tax Claims hereunder. The monthly balance of NDI is projected to average approximately $5,000 (or $15,000 per quarter) over the first twelve (12) months, with potential increases over the life of the Plan up to approximately $29,000 per month (or $87,000 quarterly). The Debtor projects that total Class 2 General Unsecured Claims, excluding insiders, will aggregate approximately $850,000. If the Debtor meets its long-term projections, the balance of NDI over the life of the five (5) year Plan will exceed $850,000 and Class 2 General Unsecured Claims shall be entitled to receive surplus distributions up to 100% of their Allowed Claims. Detailed NDI projections are attached hereto as Exhibit "C".

    5.2.3  Voting. Class 2 is impaired under the Plan and eligible to vote.

  5.3 Class 3:  Equity Interests.

    (a)  Classification. Class 3 consists of the Equity Interests.

    (b)  Treatment. On the Effective Date or as soon as practicable thereafter, all existing Equity Interests in the Debtor shall be retained by and vest in the pre-petition Equity Interest Holder. No cash distribution shall be made to the Equity Inter Holder under this Plan on account of such Interest.

(c) <u>Voting</u>. The Class 3 Equity Interest holder is not eligible to vote because of his insider status.

## ARTICLE VI
## Impaired and Unimpaired Classes

6.1 <u>Classes of Claims Impaired by the Plan and Entitled to Vote.</u> Allowed Claims in Class 1 and Class 2 are Impaired and the holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

6.2 <u>Acceptance by an Impaired Class of Claims.</u> Consistent with Section 1126(c) of the Bankruptcy Code, and except as provided in Section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

6.3 <u>A Class of Interests are Unimpaired by this Plan and is Conclusively Presumed to Accept this Plan.</u> Holders of Allowed Class 3 interests are deemed Unimpaired by the Plan. Under Section 1126(f) of the Bankruptcy Code, the holders of these Interests are conclusively presumed to accept the Plan, and the acceptances of holders of such Allowed Interests shall not be solicited.

6.4 <u>Confirmation Pursuant to Section 1191 of the Bankruptcy Code ("Cram Down").</u> With respect to any Impaired Class that does not accept the Plan or is deemed to have rejected the Plan pursuant to Section 1126(f) of the Bankruptcy Code, the Debtor reserves the right to request that the Bankruptcy Court "cram down" any such Class(es) and confirm the Plan in accordance with Section 1191(b) of the Bankruptcy Code based on the following criteria: (i) the Plan is fair and equitable to each impaired class of creditors that does not accept the Plan; (ii) the Debtor's projected disposable income of approximately $30,000 per month initially, with potential increases over the life of the Plan up to approximately $55,000 per month, will be used for payments under the Plan; and (iii) there is a reasonable likelihood that all proposed Plan payments will be made.

## ARTICLE VII
## Unexpired Leases and Executory Contracts

7.1 <u>The Astor Agreement.</u> The Debtor operates its business pursuant to the pre-petition Agreement with Astor. On the Effective Date, the Debtor shall be deemed to have assumed the Agreement pursuant to 11 U.S.C. Section 365.

## ARTICLE VIII
## Means for Implementing the Plan

8.1 The Plan shall be funded by a new value contribution of $40,000 from the Debtor's principal and through NDI derived from the monies due to the Debtor under the

Agreement with Astor ("Total Distributable Cash"), projected to average approximately $30,000 per month over the first twelve (12) months after payment of salaries and other expenses, with potential increases over the life of the Plan up to approximately $55,000 per month. Detailed NDI projections are attached hereto as Exhibit "C". The Debtor's cash obligations on the Effective Date of the Plan are itemized as follows:

a. Distribution to the Debtor's Chapter 11 Attorneys and Subchapter V Trustee $75,000
b. Initial quarterly payment to the Priority Tax Creditors $4,500
c. Initial monthly payment to the Lender $24,667
d. Initial projected quarterly *pro rata* distribution to Unsecured Creditors $15,000

## ARTICLE IX
## Disputed Claims Reserve

9.1 Disputed Claims Reserve. The Debtor shall maintain an appropriate reserve with respect to any claims under objection as of the Confirmation Date, other than the Lender's Claim which has been resolved and finally allowed pursuant to the Lender Settlement. There shall be no payments or distributions to a Disputed Claim until such claim is deemed Allowed in whole or in part.

9.2 No Interest. No holder of an Allowed Claim shall receive interest on its pre-petition claim or any distribution to which such holder is entitled hereunder, regardless of whether such distribution is made on the Effective Date or thereafter.

9.3 Undeliverable or Unclaimed Distributions. All distributions under the Plan to any holder of an Allowed Claim shall be made at the address of such holder according to the Debtor's records, unless the Debtor has been notified in writing after the Effective Date of a change of address. Any creditor that is entitled to receive a cash distribution under the Plan but that fails to cash a check within one hundred twenty (120) days of its issuance shall be deemed to have forfeited the amount of the distribution and the right to receive any future distributions.

## ARTICLE X
## Injunction, Release and Exculpation

10.1     Injunction.  Except (i) as otherwise provided in the Plan or Confirmation Order or (ii) to enforce the Plan or Confirmation Order, on and after the Effective Date, all persons and entities that have held, currently hold, or may hold, a Claim, Lien, Interest or other liability against or in the Debtor that would be discharged or satisfied upon confirmation of the Plan and the Effective Date but for the provisions of Section 1141(d)(3) of the Bankruptcy Code are permanently enjoined from taking any of the following actions on account of such Claim, Lien, Interest or right: (a) commencing or continuing in any manner any action or other proceeding on account of such Claim, Lien, Interest, or right against the Debtor, its successor, their respective property or any other property that is to be distributed under the Plan or otherwise by the Debtor; or (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order against the Debtor, its successors, their respective property or any other property to be distributed under the Plan or otherwise by the Debtor. On and after the Effective Date, each holder of an Interest in the Debtor is permanently enjoined from taking or participating in any action that would interfere with or otherwise hinder the Debtor from implementing the Plan or the Confirmation Order.  Notwithstanding the foregoing, nothing herein shall constrain or prohibit any creditor from taking any enforcement action or other legal action against Debtor's principal, Elisha Bensoussan.

10.2     Exculpation.  Notwithstanding any other provision of the Plan, neither the Debtor nor its officers, directors, members, employees or other agents, financial advisors, attorneys, accountants or Professionals shall have any liability to any holder of any Claim or Interest for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the Chapter 11 Case, or any of the transactions contemplated under the Plan, except for liability resulting from conduct constituting gross negligence, willful misconduct or breach of fiduciary duty as determined by a Final Order of the Bankruptcy Court

## ARTICLE XI
## Conditions Precedent to the Effective Date

11.1     Condition Precedent to the Effective Date of the Plan.  The entry of the Confirmation Order, payments due under the Lender Settlement (including the residual cash and $10,000 monthly payments) have been made prior to entry of the Confirmation Order, and the initial payment of $24,666.67 to Lender are the only conditions to the Effective Date of the Plan.

## ARTICLE XII
## Discharge; Limitation of Liability

12.1     Discharge.

(a)     If this Plan is confirmed under Section 1191(a) of the Bankruptcy Code, on the Effective Date of the Plan, the Debtor shall be discharged from any debt that

arose before Confirmation of this Plan, to the extent specified in Section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt:

      i. imposed by this Plan; or

      ii. to the extent provided in Section 1141(d)(6)

(b) If this Plan is confirmed under Section 1191(b) of the Bankruptcy Code, confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge upon completion of all payments due hereunder over the sixty (60) month period following the Effective Date, as otherwise provided in Section 1192 of the Bankruptcy Code. The Debtor will not be discharged of any debt:

      i. on which the last payment is due after the five (5) years of this Plan, as otherwise provided in Section 1192 of the Bankruptcy Code; or

      ii. excepted from discharge under Section 523(a) of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## ARTICLE XIII
## Miscellaneous Provisions

13.1 <u>Bankruptcy Court to Retain Jurisdiction</u>. Notwithstanding entry of the Confirmation Order, the occurrence of the Effective Date, consummation of the Plan, the Chapter 11 Case having been closed, or a Final Decree having been entered, the Bankruptcy Court shall have and retain jurisdiction of matters arising in or related to the Chapter 11 Case and the Plan under, and for the purposes of, Sections 105(a), 1127, 1142 and 1144 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To consider any modification of the Plan under Section 1127 of the Bankruptcy Code and/or modification of the Plan before "substantial consummation" as defined in Section 1101(2) of the Bankruptcy Code, except with respect to the Lender Settlement, and to consider any modification of the Plan to cure any defect or omission, or to reconcile any inconsistency in the Plan or in any order of the Bankruptcy Court.

(b) To determine any and all objections to claims, adversary proceedings, applications, and contested matters filed or commenced by the Debtor, including, without limitation, any Causes of Action.

(c) To ensure that all distributions and Plan payments are accomplished as provided in the Plan.

(d) To protect the Debtor's estate from adverse claims or interference inconsistent with the Plan.

(e) To hear and determine all applications for compensation and reimbursement of expenses of Professionals under Sections 330 and 503(b) of the Bankruptcy Code for services rendered and expenses incurred prior or subsequent to the Confirmation Date.

(f) To enter a Final Decree closing the Chapter 11 Case.

(g) Without limiting the generality of the foregoing and notwithstanding the Effective Date and to the fullest extent permitted by law, the Bankruptcy Court shall retain exclusive jurisdiction over the Plan and administration of the Debtor's estate after the Effective Date, including, without limitation, jurisdiction to resolve any and all controversies, suits and issues that may arise in connection herewith, provided however, that in the event of default under the Plan by the Debtor for failing to make payment to Lender, Lender shall be entitled to enforce the Plan terms in any court of competent jurisdiction, including collection actions and procedures.

13.2 Binding Effect of the Plan. Nothing contained in the Plan shall limit the effect of confirmation as set forth in Section 1141 of the Bankruptcy Code. The provisions of the Plan shall be binding upon and inure to the benefit of the Debtor, any holder of a Claim or Interest, and their respective predecessors, successors, assigns, agents, officers, managers, members and directors.

13.3 Successors and Assigns. The rights and obligations of any creditor shall be binding upon, and shall inure to the benefit of, the successors and assigns of such creditor.

13.4 Authorization of Corporate Action. Upon the entry of the Confirmation Order, all actions contemplated by the Plan shall be deemed authorized and approved in all respects (subject to the provisions of the Plan).

13.5 Amendments and Modifications to Plan. The Plan may be altered, amended or modified from time to time by the Debtor, before or after the Confirmation Date, as provided in Section 1127 of the Bankruptcy Code, except with respect to the Lender Settlement. The Debtor may also seek to modify the Plan at any time after confirmation so long as (a) the Plan has not been substantially consummated, and (b) the Bankruptcy Court authorizes the proposed modification after notice and a hearing.

13.6 Section 1125(e) of the Bankruptcy Code. Confirmation of the Plan shall constitute a finding that the Debtor has proposed and solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code

Dated: New York, New York
September 11, 2024

| | |
|---|---|
| Insource Supplies LLC | Goldberg Weprin Finkel Goldstein LLP<br>Attorneys for the Debtor<br>125 Park Avenue, 12th Floor<br>New York, NY 10036 |
| By: */s/ Eli Bensoussan*<br>　　Eli Bensoussan | By:　*/s/ Kevin J. Nash*<br>　　　Kevin J. Nash |