UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| | |
| Insource Supplies LLC, | Case No. 24-10571-JPM |
| | |
| Debtor. | |

-----------------------------------------------------------x

### DECLARATION OF ELI BENSOUSSAN IN SUPPORT OF CONFIRMATION OF DEBTOR'S SECOND AMENDED SUBCHAPTER V PLAN OF REORGANIZATION

I, Eli Bensoussan, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief;

1. I am the managing member of Insource Supplies LLC (the "<u>Debtor</u>" or the "<u>Company</u>"), and as such, I am fully familiar with the facts and circumstances set forth herein. I submit this declaration (the "Declaration") in support of confirmation of the Debtor's Second Amended Subchapter V Plan of Reorganization [ECF No. 46] (as may be amended, modified, or supplemented from time to time, the "<u>Plan</u>").

## I. Background

2. As explained in detail in the Plan, the Debtor is a medical supply company previously operating in the secondary market prior to bankruptcy. The company started by supplying personal protective equipment (i.e. gloves and masks) and its revenues grew quickly after the start of the pandemic. After COVID-19 subsided, revenues declined considerably.

3. The Debtor has repositioned its business to serve as an independent sales agent for Astor Pharmaceutical LLC ("<u>Astor</u>"). Prior to bankruptcy, Astor and the Debtor entered into a new agreement, denominated as the "Independent Contractor Agreement" (the "<u>Agreement</u>"), which will be assumed as part of the Plan for purposes of 11 U.S.C. §365.

4. The Debtor has projected that its new relationship with Astor will minimize the cost

and expenses of buying and delivering supplies (as the Debtor will generate sales only, while Astor will be responsible to fill the orders) and will generate about $50,000 per month in revenues during the first year, with increases thereafter. The Debtor projects it will be able to generate Net Disposable Income of at least $30,000 per month ("NDI") initially, with increases thereafter, averaging approximately $41,577 over the life of the five (5) year Plan.

5.      While the summer months were seasonally slow, business has picked up. In fact, I am happy to report that the Debtor's revenue for the month of October represents the best month in the last two (2) years as the Debtor generated sales of over $1.7 million gross revenue with estimated profits of $250,000. At this rate, the Debtor will easily be able to meet the projections under the Plan and perhaps will exceed them.

6.      The Plan provides that any excess NDI will be distributed to creditors to pay up to 100% of the allowed Class 2 claims.

**II.     The Plan**

7.      The Plan is the culmination of lengthy and intense negotiations among the Debtor and CFBank National Association (the "<u>Lender</u>"), which have entered into the Stipulation of Settlement attached to the Plan as Exhibit A providing for the allowance and treatment of the Lender's secured claim and the use of cash collateral.

8.      The Plan provides treatment for three (3) classes of claims: (a) Class 1 - the Lender's partially secured claim in the allowed amount of $1,500,000, (b) Class 2 - the allowed claims of general unsecured creditors aggregating approximately $850,000, and (c) Class 3 - equity interests. The Plan also provides for payment in full of allowed Administrative Claims and Priority Tax Claims over time.

9.      To date, the Debtor has received two (2) ballots. One (1) ballot from the Lender,

as the holder of the Class 1 secured claim, voting to accept the Plan, and one (1) ballot form a general unsecured creditor, voting to reject the claim.

### III. Compliance with Section 1129 of the Bankruptcy Code

10. Section 1129(a)(l). The Plan has been filed in good faith and complies with the Bankruptcy Code.

11. Section 1129(a)(2). The Plan also complies with the applicable provisions of the Bankruptcy Code. The Plan properly classifies claims based upon secured and unsecured status, with the Lender's secured claim given a priority by reason of its first lien and security interest.

12. Section 1129(a)(3). The Plan was proposed in good faith and not by any means forbidden by law. The Debtor's objective from the inception of this proceeding has been to propose a consensual plan which provides a fair and equitable treatment for all creditors

13. Section 1129(a)(4). Pursuant to Article III of the Plan, payment of the fees of the Subchapter V trustee and the Debtor's counsel remain subject to Bankruptcy Court approval and shall be funded in large measure by a capital contribution from the Debtor's principal.

14. Section 1129(a)(5). The requirement of Section 1129(a)(5) providing for the Plan proponent to disclose all necessary information regarding directors, officers, and insiders is satisfied. Article V of the Plan discloses that Eli Bensoussan shall retain his 100% equity interest in the Debtor and continue to serve as the Debtor's managing member.

15. Section 1129(a)(6). Because the Plan does not propose any rate changes, Section 1129(a)(6) does not apply.

16. Section 1129(a)(7). The Plan complies with the best interests test under Section 1129(a)(7) of the Bankruptcy Code. Since creditors will be paid in accordance with the priority scheme under the Bankruptcy Code and the Debtor's liquidation analysis provides that, if the

Debtor's business was liquidated, there would be no funds available to pay unsecured claims given the marginal liquidation value of the Company's assets. The Plan meets the test under section 1129(a)(7).

17.     Section 1129(a)(9). The Plan properly provides for the payment of taxes within the five year term of the Plan and administrative expense claims shall be paid separately on terms agreed to with the Debtor or as fixed by Order of the Court..

18.     Section 1129(a)(10). The Plan has been accepted by Class 1 claimholders. Accordingly, the requirement of Section 1129(a)(10) that at least one impaired class accept the Plan has been satisfied.

19.     Section 1129(a)(11). The Plan is feasible based upon my new value contribution of $40,000, together with the projected NDI derived from the Debtor from the monies due under the Agreement with Astor.

20.     Section 1129(a)(12). The Debtor does not, and will not, owe any fees and/or costs to the Clerk of the Court under 28 U.S.C. § 1930. Thus, the Plan complies with the requirements of Section 1129(a)(12) of the Bankruptcy Code.

21.     I am advised that the balance of the requirements under 11 U.S.C. § 1129(a)(13), (14), (15) and (16) do not apply to the Debtor.

**IV.     Compliance with 11 U.S.C. 1191(b) of the Bankruptcy Code**

22.     I understand that the claims in Class 2 did not vote favorably, so the Debtor intends to proceed under 11 U.S.C. § 1191(b), which provides that an impaired class need not vote in favor of a plan under 11 U.S.C. § 1129(a)(8) if the plan does not discriminate unfairly, and is fair and equitable, with respect to such class.

*a. Plan Does Not Discriminate Unfairly Against Impaired Classes Not Accepting the Plan*

23.     The Plan does not discriminate unfairly against holders of Class 2 claims because Class 2 consists of all allowed general unsecured claims and therefore all similarly situated creditors will receive the same recovery under the Plan.

*b. Plain Is Fair and Equitable to Impaired Classes Not Accepting the Plan*

24.     Section 1191(c).  I understand that a plan is fair and equitable if it (1) complies with 1129(b)(2)(A) with respect to secured claims, (2) provides that all of the projected disposable income of the debtor to be received over a 3 to 5 year period will be applied to make payments under the plan, and (3) there is a reasonable likelihood that the debtor will be able to make all payments under the plan.  The Debtor's Plan is fair and equitable as it (a) complies with 1129(b)(2)(A) with respect to the Lender's secured claim and the Lender has voted in favor of the Plan, (b) provides for the distribution of 100% of NDI to holders of allowed Class 1 and Class 2 claims, up to 100% of the their claims, over a period of up to 5 years, and (c) is reasonably likely to make all payments under the Plan based on its projected NDI from the Astor Agreement as discussed above.

For all of the reasons set forth above, the Plan should be confirmed even without an affirmative vote form Class 2.

Dated:      New York, New York
            _____, 2024

            _____
                        Eli Bensoussan